# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| UNIWELL LABORATORIES, LLC, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:21-CV-1292-BJ |
| | § | |
| | § | |
| FRAIN INDUSTRIES INC., ET AL. | § | |
| DEFENDANTS. | § | |

## MEMORANDUM OPINION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    INTRODUCTION

This case arises out of a business agreement between Plaintiff UniWell Laboratories, LLC ("UniWell" or "Plaintiff") and Defendants Frain Industries Inc. ("Frain Industries"), The Frain Group ("Frain Group"), and REF Leasing, Co. ("REF Leasing") (collectively referred to as "Defendants" or "Frain"). On October 5, 2021, UniWell filed a petition in state court alleging claims against Defendants. On November 22, 2021, the case was removed to this Court. As set forth in the Joint Pretrial Order ("JPO") dated September 27, 2023, Plaintiff brings claims against Defendants for "breach of contract, fraud, and other fraud-related claims," seeking "the return of the price paid to Defendants, the recovery of its reasonable and necessary attorneys' fees, and the time value of money, or fair market interest." (JPO at page ("p.") 1, 3.)[1] Defendants bring a counterclaim for breach of contract against Plaintiff, and, alternatively, equitable claims of promissory estoppel and quantum merit. (JPO at p. 3.) The Court held a bench trial on this matter on October 2-3, 2023. After careful consideration of the evidence and

---

[1] After the parties consented, the case was transferred on January 30, 2023, to the docket of the undersigned.

arguments presented at trial and all of the written submissions by the parties, the Court issues this memorandum opinion with findings of fact and conclusions of law.

## II.      GENERAL FINDINGS OF FACT[2]

1.      UniWell is a Texas limited liability company with its principal place of business in Fort Worth, Texas. (JPO at p. 4.)

2.      Defendants are all Illinois corporations with their principal places of business in Carol Stream, Illinois.  (JPO at p. 4.)

3.      Defendant REI Leasing is the financing arm of Frain.  (*See, e.g.*, Oct. 3, 2023, Trial Transcript ("Oct. 3 Trial Tr.") 140.)

4.      The amount in controversy exceeds $75,000.

5.      Jurisdiction and venue is proper in the United States District Court for the Northern District of Texas, Fort Worth Division.

6.      In late February 2021 to early March 2021, Andrew Thomas Riess, II ("Riess"), the Chief Operating Officer of UniWell, contacted Tami Frain, currently the President of Strategic Partnerships at Frain,[3] numerous times by telephone or zoom to discuss acquiring a liquid rotary filler with multiple machines to fulfill a commitment UniWell had with GOJO Industries, the owners of Purell and one of UniWell's customers, for a large order of hand sanitizer.  (*See* October 2, 2023, Trial Transcript ("Oct. 2 Trial Tr.") at 21-24, 27-28, 58-

---

[2] Unless otherwise indicated, all findings of fact are supported by a preponderance of the credible evidence admitted at trial.  In addition, to the extent any finding of fact is more properly construed as a conclusion of law, it is adopted as such.  To the extent any conclusion of law is more properly construed as a finding of fact, it is adopted as such.  Moreover, the Court's citations to evidence in support of its findings are not meant to be citations to every piece of evidence in the record that supports (or possibly contradicts) such finding as such an exhaustive listing would be a near impossible task.  If the evidence cited does not support the Court's actual finding, it is because the Court ultimately made a credibility determination and rejected such evidence.

[3] During the UniWell project, Tami Frain was an account manager, which is also known as a sales manager.  (Oct. 3 Trial Tr. 2.)

59, 137, 144, 146-48, 181; October 3, 2023, Trial Transcript ("Oct. 3 Trial Tr.") 2, 5-7; *see* Trial Exhibit ("Trial Ex.") 64.)  Other individuals, including Eduardo Soto ("Soto"), the Chief Operating Officer and majority shareholder of UniWell, and Bo Bailey ("Bailey"), Maintenance Manager at UniWell, were on some of these telephone and/or zoom calls.  (*See* Oct. 2 Trial Tr. at 20, 23-25.)

7.    During March 2021, UniWell and Defendants negotiated the terms of a transaction by which Defendants would, on an expedited basis, refurbish, configure, and crate for delivery integrated packaging machinery, specifically a two-ounce rotary line filler, consisting of nine machines (the "Machines") to be used by UniWell for packaging and labeling a twenty-million bottle purchase order of hand sanitizer for GOJO Industries. Frain represented that they could do the above work in approximately ten weeks.  (*See, e.g.*, Oct. 3 Trial Tr. 58, JPO at p. 5.)

8.    While UniWell already had machines that could bottle hand sanitizer at a much slower rate, UniWell was looking to acquire machines that could bottle twenty million two-ounce bottles of hand sanitizer at a rate of approximately 120 bottles per minute (which was about two to three times faster than UniWell's existing machines).  (*See* Oct. 2 Trial Tr. at 21-24, 27-28, 58-59, 137, 144, 146-48, 181; Oct. 3 Trial Tr. 2, 5-7; *see* Trial Exs. 20, 64.)

9.    Because Frain represented that it could refurbish its machines to meet UniWell's needs substantially faster, UniWell cancelled a purchase order with a different supplier[4] for brand new machines and equipment and agreed to pay approximately $400,000 more for

---

[4] The other supplier could get the machines to UniWell in approximately 24 weeks.  (Oct. 3 Trial Tr. 159.)

the refurbished machines from Frain.   (Oct. 2 Trial Tr. 22, 33, 59-60, 112-13, 155; October 3 Trial Tr. 106; *see* Trial Exs. 55, 56, 64)

10. On or about March 16, 2021, UniWell placed a verbal purchase order for the machines, requesting to finance the order for the Machines, whereupon Defendants ultimately submitted to UniWell and UniWell received via email Defendants' final invoice 722805-3[5] from REF Leasing, dated March 16, 2021.   (JPO at p. 5; *see* Trial Exs. 47, 54.)   There are two invoices labeled as 722805-3 and both are identical to invoice 722805-2, *infra*, except they reflect payments from UniWell that Frain had already received (one on 3/23/2021 and one on 4/27/2023, respectively) and that a final payment of $111,253 was now due.   (*Id*; *see* Trial Exs. 19, 47, 54.)

    a. The following other invoices were emailed to UniWell prior to the final invoice 722805-3:

        (1) On March 17, 2021, Frain emailed to UniWell an invoice, 722805 from REF Leasing, which indicated that eight pre-owned machines were to be leased to UniWell on a thirty-month lease basis, set to start on 7/1/2021, with monthly payments of $38,000 for the term of the lease, with an additional $100,000 downpayment due with the order, an additional $100,000 payment due in thirty days, and an additional payment of $111,253 due in sixty (60) days, prior to shipment (of which $11,253

---

[5] While this particular invoice is dated March 16, 2021, it was actually sent to UniWell for the first time on or around April 19, 2021. (*See* Trial Ex. 47.) However, the Court references this invoice first because this is the invoice stipulated to by the parties in their JPO, but it will set forth the other invoices, *infra*. (JPO at p. 5.) Apparently, when any money is paid to Defendants, it is recorded in the system and a new invoice for the customer is generated showing the payments made and total still due. (Oct. 3 Trial Tr. 28; *see also* Tr. 54 (email dated May 19, 2021, from Defendants to Soto, reminding Soto of upcoming 60-day progress payment due on 5/23/2021, with invoice 772805-3 attached).)

represented crating costs).  The invoice also included a $1.00 buyout at the end of the lease.  (Trial Ex. 7.)

(2) On March 19, 2021, Frain emailed to UniWell a revised invoice, 772805-1 from REF Leasing, that was identical to the original invoice except one of the machines, the Resina Capper, was a different machine than in the original invoice.  (Trial Ex. 13; *see* Oct. 2 Trial Tr. 74; Oct. 3 Trial Tr. 23-24.)

(3) On March 22, 2021, Frain emailed UniWell a second revised invoice, 722805-2 from REF Leasing, for nine machines (as opposed to eight) to be leased to UniWell.  The ninth machine was a Markem Coder.  The term of the lease was thirty-one months, set to begin on July 1, 2021, with thirty monthly payments of $38,000 and the thirty-first payment of $16,357. The second revised invoice also required a $100,000 down payment due with the order, an additional $100,000 payment due in thirty days, and an additional payment of $111,253 due in sixty days, prior to shipment (of which $11,253 represented crating costs).  The invoice also included a $1.00 buyout at the end of the lease.  This invoice also included a new provision that "[l]ead time is 10 weeks from receipt of deposit payment, signed lease agreement and testing materials." (Trial Ex. 19; *see* Oct. 2 Trial Tr. 77; Oct. 3 Trial Tr. 26-27; JPO at p. 5.)   Tami Frain added the language regarding the new

provision regarding the lead time[6] based on a zoom call she had with Soto earlier that day.  (Oct. 2 Trial Tr. 25-27.)

11. Also on March 22, 2021, Frain sent an email to UniWell, attaching a thirteen-page document titled "Proposal for Engineered Services."   Such proposal described and contained a photograph of each of the nine Machines, included both a buy and borrow option, and reflected a total purchase price of $1,375,000.00 for all the Machines.  (Trial Ex. 20; Oct. 3 Trial Tr. 8; *see* JPO at p. 5.)

12. The Proposal for Engineered Services states that Frain has an inventory of "over 8,000 machines," "[a]ll [of Frain's] machines are in stock and immediately available" and that "[Frain] can have them on the way into [Frain's] shop for Engineered Services or on the road to your plant within 48 hours."  (Trial Ex. 20.)

13. The Proposal for Engineered Services also states, "**Projected Equipment Setup Time: 10 to 12 weeks[.]**  Actual projected set up time will be quoted upon receipt of samples. Project begins upon receipt of 50% of Purchase Price with crating fee, and delivery of the required product and packaging samples to the Frain Group.   Balance due upon acceptance at our Engineered Service facility and prior to shipment."[7]  (Trial Ex. 20.)

14. Frain holds itself out as the leading, single-source provider of new and used plug and play packaging and processing machinery; markets itself based on speed of delivery; claims it can integrate, test, and install a complete line in less than six weeks; claims that customers gain the competitive advantage of getting products to market faster than anyone else through Frain's accelerated approach, unmatched services, and quality

---

[6] Lead time refers to the time needed prior to the Factory Acceptance Test.  (Oct. 3 Trial Tr.  132.)

[7] The second two sentences were in much smaller-sized font than the first sentence.

machinery; and has over 8,000 machines in stock and immediately available. (*See* Trial Ex. 20; Oct. 3 Trial Tr. 2-4.)

15. UniWell anticipated that it would be "live and running" about two weeks after the Factory Acceptance Test ("FAT") was completed, which is the time it would take for Frain to complete any punch list and disassemble the machines and for UniWell to have the Machines delivered and reassembled at their plant. (Oct. 2 Trial Tr. 80-81.)

16. While none of the official written and signed contract documents expressly state that "time is of the essence," from the inception of the negotiation of the transaction, UniWell advised Defendants that time was of the essence for the delivery of the machines due to UniWell's urgent need for this high-speed packaging capacity. (*See, e.g.*, Trial Ex. 21 (email from Riess to Tami Frain dated Mar. 23, 2021 in which Reiss, *inter alia*, states "Please have the process started ASAP! . . . . Time is of the essence . . . .").)

17. During the initial negotiations, Frain represented to UniWell that it had all the Machines in stock and did not **expressly** tell UniWell that it needed to order any parts or components or might experience delays in getting needed parts from its suppliers to refurbish the Machines. (*See* Oct. 2 Trial Tr. 32-33, 151-52, 160-61; Oct. 3 Trial Tr. 108.)

18. On or about March 23, 2021, Mary Woodrick, Director of Project Management at Frain, emailed UniWell a Project Confirmation Letter ("PCL") signed by Woodrick, which outlined the scope of services to be provided and included, *inter alia*, shipping and payment terms, a list of required testing materials to be provided by UniWell to Frain, the specific dates these materials were needed, and other terms and conditions. Bailey, on

behalf of UniWell, executed the PCL on March 31, 2021. (Trial Ex. 35; *see* Oct. 3 Trial Tr. 57, 66; JPO at p. 5.)

19. The PCL states (in a font larger than used in the rest of the PCL): "Estimated Factory Acceptance Test for this project: **06/01/2021**." (Trial Ex. 35 (emphasis in original); *see* JPO at p. 6.) The PCL further states in bold (in a font larger than used in the rest of the PCL but in a smaller font that the previous sentence): "Please note that a delay will occur if product samples and test materials are not received." (Trial Ex. 35.) The fourth paragraph of the Terms and Condition section of the PCL further states, "Production estimates are approximations and are not guaranteed." (Trial Ex. 35.)

20. A section titled Required Testing Materials under the main heading of "Project Overview" in the PCL sets forth four specific materials that were to be sent by UniWell and received by Frain by April 5, 2021 ("April 5 testing materials"[8]), and an additional four were to be sent by UniWell and received by Frain by May 10, 2021 ("May 10 testing materials"[9]). (Trial Ex. 35; *see* JPO at p. 5.)

21. The last paragraph of the "Terms and Conditions" section of the PCL states:

> In no event shall The Frain Group be liable for special, indirect, incidental, or consequential damages, whether in contract, tort, negligence strict liability or otherwise, including without limitation damages for injury to person or property, lost profits or revenue, lost sales or loss of use of any machinery. Customer's sole and exclusive remedy against The Frain Group is the repair or replacement or [sic] improperly working parts refurbished by The Frain Group for a period of 180 days from date of shipment. The Frain Group's liability on any claim of whatever nature for any loss or damage arising out of or in connection with the customer's order shall in no case exceed the amount of money actually received by The Frain Group from the customer.

---

[8] The April 5 testing materials consisted of: (1) 2,000 production containers, (2) 2,000 production caps; (3) 1 full roll of labels; and (4) 30 gallons of hand sanitizer. (Trial Ex. 35.)

[9] The May 10 testing materials consisted of: (1) 13,000 production containers; (2) 13,000 production caps; (3) 3 full rolls of labels; and (4) 2 totes of hand sanitizer. (Trial Ex. 35.)

(Trial Ex. 35.)

22. Under the terms of the PCL, "[t]he Factory Acceptance Test . . . is a major milestone in any project." (Trial Ex. 35.) The purpose of the FAT is to verify that manufactured (or in this case, refurbished and reconfigured) equipment meets the requirements for the purchaser's intended purpose. (*See* Trial Ex. 35.)

23. In an email also dated March 22, 2021, from Tami Frain to Soto, Tami Frain, *inter alia*, wrote, "As noted, the lead time is 10 weeks from receipt of invoice payment, signed lease agreement and testing materials. Please send . . . 15,000 containers[,] 15,000 caps[,] 4 full rolls of labels[,] [t]wo totes of product[.]" (Trial Ex. 18.)

24. UniWell sent to Frain the required three (3) installment payments of $100,000 each on March 23, 2021, April 27, 2021, and May 21, 2021, respectively, plus a payment of $11,253 on May 21, 2021, for crating of the Machines, for a total amount of $311,253, which Frain accepted and retained.[10] (*See* Trial Exs. 21, 39, 54; Oct. 2 Trial Tr. 35; JPO at p. 5.)

25. On March 30, 2021, and March 31, 2021, Angela Harrison ("Harrison"), a staff accountant at Frain, emailed Soto a copy of a Lease Agreement consistent with the terms contained in invoice 772805-2, *supra*, and requested Soto to sign the Lease Agreement through a service called Sertifi.[11] (Trial Exs. 31-33; *see* Trial Ex. 19; Oct. 3 Trial Tr. 99.) Soto found these emails and the copy of the Lease Agreement in his junk mail folder after the parties participated in a mediation in this case. (Oct. 2 Trial Tr. 201.)

---

[10] The second payment, made on April 27, 2021, happened after the estimated FAT date had been moved from June 1 to June 8, 2021. The third payment and the payment for $11,253 for the crating of the Machines, made on May 21, 2021, happened after the FAT date had been moved to June 18, 2021. (Trial Ex. 56.)

[11] Sertifi is a program that allows Frain to send a document via email so that the customer can sign and date it and return it electronically. (Oct. 3 Trial Tr. 66.)

26. In an email dated April 5, 2021, from Woodrick to Bailey, Woodrick thanked Bailey for sending the signed PCL and requested that the April 5 testing materials be sent. Woodrick further stated that "[i]f these production materials are received by 4/12, your estimated FAT is 6/8." (Trial Ex. 39.)

27. On April 6, 2021, Reiss sent Woodrick an email stating that the FAT date needed to be pulled back to June 1 and that the requested materials should arrive by April 12. (Trial Ex. 41.) Woodrick responded with an email stating, "The samples below were requested by 4/5. How soon can you get those here?" (Trial Ex. 41.)

28. Frain received the April 5 testing materials on April 12, 2021. (*See* Oct. 2 Trial Tr. 89-91; Oct. 3 Trial Tr. 71-72; Trial Exs. 44, 134; JPO at p. 6.)

29. In an email dated, April 16, 2021, from Woodrick to Riess and Bailey (with several others copied), Woodrick stated, "The machines are on the shop floor and we have components on order. Our technical team is working on your line and I will keep you posted as we move forward." (Trial Ex. 46.)

30. UniWell did not raise any objections to the fact that Defendants had to order components until approximately a month after the April 16, 2021 email from Woodrick.

31. In an email dated May 6, 2021, from Woodrick to Riess and Tami Frain (with several others copied), Woodrick wrote, "We are on target for the estimated FAT date of 6/1, however I will lock in actual FAT date one week prior. Please ship remainder of production materials . . . ." (Trial Exs. 50, 52.) In an email also dated May 6, 2021, from Riess to Soto, Riess relayed the information that the project was still on track for a FAT date of June 1, 2021, and that the exact FAT date would be locked in "for sure 1 week prior." (Trial Ex. 51.)

32. Woodrick never tells a customer to delay sending required testing materials as such materials are needed to advance the project.  (Oct. 3 Trial Tr. 68-69.)

33. UniWell was first notified sometime the week of May 17, 2021, that the FAT was being delayed because Frain was not able to obtain certain components.  (*See, e.g.*, Trial Ex. 56; Oct. 2 Trial Tr. 49, 108; Oct. 3 Trial Tr. 59, 75.)

34. On May 26, 2021, Riess sent an email to Woodrick, Bailey, and Tami Frain (with several others copied) stating, *inter alia*, "I was told by [Bailey] that [Woodrick] called last week that the Acceptance was pushed out due to Frain not being able to obtain certain components.  Can I get in writing what the delay was."  (Trial Ex. 56.)

35. Woodrick responded to Riess' email on May 27, 2021, stating, "We are waiting on container handling parts, infeed star, timing screw, discharge star as well as miscellaneous electrical components for explosion proof.  We are currently estimating 6/18 for the FAT, but will lock in actual date one week prior."  (Trial Ex. 56.)

36. According to Woodrick, Frain was only waiting on component parts for one machine, the filler and could simulate running the other eight machines as soon as it received the May 10 testing materials from UniWell.  (Oct. 3 Trial Tr. 76-77.)

37. Reiss, later on May 27, 2021, responded to Woodrick's email by offering "some constructive criticism of how the project has gone so far" and requesting answers to the lack of communication and the missing of the June 1 FAT date.  (Trial Ex. 56.)  Subsequently, also on May 27, Woodrick replied by thanking Reiss for his feedback and stated that Frain would meet as a team to discuss.  (Trial Ex. 58.)

38. On June 2, 2021, Reiss responded to Woodrick, making a request for "a discount on the price."  (Trial Ex. 58.)  Later on June 2, Shawn Jackson ("Jackson"), Chief Operating

Officer for Frain, responded that Frain would "not entertain any concessions." (Trial Ex. 62; *see* Oct. 3 Trial Tr. 105.) Jackson, *inter alia*, gave UniWell the option to either cancel the partnership or move forward and "see how we could collectively get back to a partnership approach and proceed ahead in a positive manner to complete the project." (Trial Ex. 62.)

39. In an email dated June 8, 2021, Riess emailed Jackson that "Frain must finish the line. That is not up for discussion." (Trial Ex. 66.) Later on June 8, 2021, Jackson responded to Riess, advising that the FAT would be June 29, 2021, and invited UniWell to come for a progress visit. (Trial Ex. 67; *see* Trial Ex. 74.)

40. The May 10 testing materials that were to be received by Frain on May 10, 2021, were not received until June 7 and 8, 2021. (*See* Trial Exs. 57, 63, 134; Oct. 2 Trial Tr. 95, 110-11; *see* JPO at p. 6.) UniWell did not begin the process to arrange for these materials to be shipped until approximately May 28, 2021. (Trial Exs. 57, 63.)

41. By missing the original June 1, 2021, FAT deadline, UniWell lost roughly $1.8 million in revenue every 30 days. (Oct. 2 Trial Tr. 159-60.)

42. All of the components Frain needed to conduct the FAT arrived between May 6 and June 29, 2021. (Oct. 3 Trial Tr. 62.)

43. On June 22, 2021, Woodrick sent UniWell pictures of the nine machines assembled in the filling line. (Trial Ex. 73; Oct. 3 Trial Tr. 80-84.)

44. Frain began testing at least some of the Machines and the filling line prior to the FAT. (*See* Trial ex. 73; Oct. 3 Trial Tr. 80-84.)

45. Frain did not use all the materials that UniWell had sent prior to the FAT. (*See* Oct. 3 Trial Tr. 137.)

46. The FAT was conducted on June 29, 2021. (JPO at p. 6.) Riess, Eddie Carroll, one of UniWell's lead maintenance technicians, and Frankie Munez, one of UniWell's operators, travelled to Frain's facility in Carol Stream, Illinois, to observe the FAT. (Oct. 2 Trial Tr. 63, 162.) Jackson, Tami Frain, Woodrick and Mitch Budic, as well as several other employees of Frain, were also present during the initial greeting prior to the FAT, a small part of the FAT, or all of the FAT. (*See* Oct. 2 Trial Tr. 64-65; Oct. 3 Trial Tr. 12, 41, 86-87, 111.)

47. A signed lease agreement between the parties was not necessary to conduct the FAT. (Oct. 3 Trial Tr. 65, 115, 131-32.)

48. During the FAT, UniWell discovered there were several issues with the Machines and the ninth machine, the "Markem Coder" was not operational and, thus, was not a part of the FAT. (Oct. 3 Trial Tr. 131.)

49. On June 29, 2021, Reiss, on behalf of UniWell, accepted and signed a Factory Acceptance Test Confirmation for each of eight Machines that were operational during the FAT, subject to a handwritten punch list containing nine items that either needed to be fixed or were scope changes added by UniWell that needed to be completed to have the Machines ready for delivery. (*See* Trial Exs. 79, 87, 150; JPO at p. 6; Oct. 2 Trial Tr. 68-69, 120-21; Oct. 3 Trial Tr. 88-94.)

50. In early July 2021, UniWell began making arrangements for riggers and transportation services and otherwise confirmed its intent to pick up the Machines and ship them to UniWell's facility in Texas, on a free on board ("FOB") basis as set forth in the PCL. (Trial Ex. 89; JPO at p. 6.)

51. On July 1 and July 2, 2021, Defendants again sent emails to UniWell requesting the Lease Agreement be signed via Sertifi emails. (Trial Ex. 93; *see* Oct. 3 Trial Tr. 142-43.)

52. It took Defendants approximately five days after the FAT to complete the punch list items. (*See, e.g.*, Oct. 2 Trial Tr. 122-24; Oct. 3 Trial Tr. 94; Trial Exs. 87, 89, 97; JPO at p. 6.)

53. The Markem Coder, the ninth machine, was operational and ready for video approval by July 7, 2021.   (Trial Ex. 102; Oct. 3 Trial Tr. 131.)

54. After UniWell received and accepted video of the Markem Coder, the Machines were disassembled, skidded, and crated for pickup and transport to UniWell. (*See* Trial Ex. 102; Oct. 3 Trial Tr. 96.)

55. On or about July 7, 2021, UniWell paid an additional $8,720 to Defendants for startup and training to be performed at UniWell's facility in Texas. (*See* Trial Exs. 82-83, 99-101; JPO at p. 6.)

56. Defendants accepted and retained UniWell's total payments of $319,973.00, which consisted of the three installment payments of $100,000 each, a payment of $11,253 for crating of the Machines, and a payment of $8,720 for startup and training. (*See* JPO at p. 6.)

57. On July 12, 2021, Defendants notified UniWell via email that the Machines would be ready for pickup on July 13, 2021. (*See* Trial Ex. 103.)

58. On July 12, 2021, and July 13, 2021, Defendants again began following up on the Lease Agreement, requesting that UniWell sign it via Sertifi. (*See* Trial Exs. 104-107, 109-110.)

59. The Machines were placed on Frain's dock on July 13, 2021, where they remained for approximately a month to a month and a half. (*See* Trial Ex. 89; Oct. 3 Trial Tr. 129, 143.)

60. On July 14, 2021, Reiss sent an email to Patrick Tamburino, Frain's Direction of Acquisition, requesting a "fair resolution for the delay." (Trial Ex. 116; *see* Oct. 3 Trial Tr. 18.)

61. On July 22, 2021, a phone call took place between Defendants and Soto, during which Soto stated that he wanted Defendants to renegotiate the Lease Agreement to give UniWell better terms because of the delay caused by Defendants. (*See* Trial Ex. 35; Oct. 2 Trial Tr. 170-73; Oct. 3 Trial Tr. 43-46, 125.) Defendants made a proposal offering to provide UniWell with a longer financing lease term of thirty-six (36) months with decreased monthly payments. (Trial Ex. 110 (p. 3), 119, 127A; Oct. 2 Trial Tr. 172-73, 219.)

62. UniWell rejected this proposal and instead, through an email from Soto to Tami Frain dated July 22, 2021, offered a counterproposal that UniWell be allowed to pay off the balance of the equipment cost of $1,075,000 in 36 months but eliminate all interest being charged.[12] (*See* Trial Ex. 127; Oct. 2 Trial Tr. 170-74.) Soto explained that UniWell was "facing [the] loss of an important [purchase order] from a major customer representing $3.1M in revenues and $1.3M in Gross Margins <u>mainly because [Frain] could not deliver the equipment as agreed</u>." (Trial Ex. 127.) Soto also wrote, "I want to reiterate that at no point we are trying to walk away from our commitment with you." (Trial Ex. 127; Oct. 2 Trial Tr. 173-74.) Frain declined Soto's counterproposal.

63. UniWell never signed any written Lease Agreement with Defendants. (JPO at p. 6.)

---

[12] Soto testified that this would have saved UniWell approximately $250,000. (*See* Oct. 2 Trial Tr. 205.)

64. On August 3, 2021, Jackson, responding to Soto's July 22 email seeking concessions for lost margins, stated that Defendants would "only offer a cash sale option for Uni[W]ell to move forward (No Financing option will be provided)" and that UniWell must sign a "Covenant Not to Sue . . . prior to any proceeding of the above-mentioned offer." (Trial Ex. 131.)

65. On August 6, 2021, Jackson sent Soto another email and attached invoice 080621, which reflected a cash purchase price for the Machines in the amount of $1,075,000.00. The cash price was calculated by taking $1,375,000 (the original purchase price reflected in the Proposal for Engineered Services (Trial Ex. 20) plus $11,253 in crating costs for a total cost of $1,386,253 less the $311,253 already paid by UniWell). (Trial Exs. 134, 135.; *see* JPO at p. 6.)

66. On August 19, 2021, UniWell sent Defendants formal written notice of the termination of the agreement and demanded the return of all its advanced payments. (*See* JPO at p. 3 (as admitted by UniWell).)

67. During the time Defendants spent working on this project, from the end of March 2021 until early July 2021, Defendants spent approximately 2,169 man hours working on such project, which translates into approximately $349,850.00, using an average hourly rate of $150/hour for regular hours and $245/hour for overtime hours. (*See* Trial Exs. 138-40; Oct. 3 Trial Tr. 164-65.) Additionally, Defendants spent approximately $57,678.16 on ordering specific tooling parts and components to accommodate UniWell's specifications and spent approximately $35,130.00 on purchasing specific conveyors that were used by Defendants to integrate all the Machines for UniWell's production line. (Trial Exs. 138-

140; Oct. 3 Trial Tr. 146-56, 164-65.)    Furthermore, Defendants spent approximately $75,600 in management hours on the project. (Trial Ex. 140.)

68. Based on the foregoing, the total cost to Frain of the project was approximately $518,258.16.    (Trial Exs. 138-40; *see* Oct. 3 Trial Tr. 146-53, 164-65.)   However, Defendants are not seeking this amount as damages in this lawsuit. (Oct. 3 Trial Tr. At 156.)

69. Frain is seeking damages in the amount to of $1,075,000.00, which is the remainder of the original purchase price agreed to by UniWell that has not been paid. (Oct. 3 Trial Tr. 163.)

70. UniWell's total payment to Frain was $319,973.00, which includes $311,253 for the three $100,000 payments, a payment of $11,253 in crating charges and a separate payment of $8,720 for startup and training.

71. UniWell is seeking recovery of the $319,973.00 that it paid to Defendants plus attorney's fees. (Oct. 2 Trial Tr. 175-76, 233; Oct. 3 Trial Tr. 158.)

72. The Machines remain in the possession of Defendants, still crated and ready to be shipped to UniWell. (JPO at p. 6.)

73. The Machines are designed to fill two-ounce Boston round bottles with any liquid, not just hand sanitizer. (Oct. 3 Trial Tr. 166.)

74. While the Machines and the conveyance system was a custom project, the Machines could be separated and retooled for a different project. (Oct. 3 Trial Tr. 163-64.)

75. Frain has not attempted to sell the Machines or advertise them for sale because Frain does not do outside sales and obtains business when potential customers come to Frain. (Oct. 3 Trial Tr. 164.)

76. UniWell ultimately fulfilled a "big portion" of the order from GOJO Industries for the twenty-million bottles of hand sanitizer.  (Oct. 2 Trial Tr. 232; *see* Oct. 3 Trial Tr. 159.)

### III.   SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW

77. "[F]ederal courts sitting in diversity must apply state substantive law and federal procedural law." *Advon Corp. v. Coopwood's Air Conditioning Inc.*, 517 F. Supp. 3d 656, 663 (S.D. Tex. 2021).

### A.  Plaintiff and Defendants' Breach of Contract Claims Against Each Other

78. Texas courts apply Article Two of the Uniform Commercial Code ("UCC") to contracts for the sale of goods, as codified in Chapter Two of the Business and Commerce Code. *See Advon Corp.*, 517 F. Supp. 3d at 662; *Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.—Dallas 2003, no pet.) ("Contracts relating to the sale of goods are governed by article two of the [UCC], adopted in Texas as chapter two of the business and commerce code.").

79. To recover for breach of contract under Texas UCC law, a party must prove the following: (1) the existence of a valid contract between the parties, (2) performance or tendered performance by one party; (3) breach by the other party, and (4) harm to the non-breaching party as a result of the breach. *Advon Corp.*, 517 F. Supp. 3d at 663; *see Omni USA, Inc. v. Parker-Hannifin Corp.,* 964 F. Supp. 2d 805, 813 (S.D. Tex. 2013).

80. "'A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform.'" *O'Brien's Response Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*, 24 F.4th 422, 434 (5th Cir. 2022) (quoting *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)).

81. "A material breach is conduct that deprives the injured party of the benefit that it reasonably could have anticipated from the breaching party's full performance." *BigCommerce, Inc. v. Cover Genius Warranty Svcs., LLC*, No. 1:23-CV-298-DAE, 2023 WL 7413360, at *3 (W.D. Tex. July 18, 2023) (citing *Hernandez*, 875 S.W.2d at 691).

82. "'Under Texas law, time is not of the essence of a contract unless the contract explicitly makes it so or the contract is of such a nature or purpose that it indicates the parties' intention that they must perform the contract at or within the time specified.'" *Indel Food Prods., Inc. v. Dodson Int'l Parts, Inc.*, 561 F. Supp. 3d 722, 729 (W.D. Tex. 2021) (quoting *Childers v. Pumping Sys., Inc.*, 968 F.2d 565, 568 (5th Cir. 1992); *see Ganz v. Lyons P'ship, L.P.*, 961 F. Supp. 981, 986 (N.D. Tex. 1997) ("The general rule is that time is not of the essence in a contract unless the parties expressly make it so, or there is something in the nature or purpose of the contract and the circumstances surrounding it which make it apparent that the parties intended that time be of the essence."). "That a contract specifies a performance deadline does not, by itself, make time of the essence." *Indel Food Prods.*, 561 F. Supp. 3d at 729. "If the contract terms do not indicate whether time is of the essence, surrounding circumstances may be considered." *Id.* (citing *Laredo Hides Co. v. H & H Meat Prods. Co.*, 513 S.W.2d 210, 217 (Tex. Civ. App. 1974 (collecting cases))); *see Ganz*, 961 F. Supp. at 986 (finding that a jury could conclude that time was of the essence based on the parties' communications prior to finalizing the contract).

83. "When time is of the essence of a contract, a party's failure to meet contract deadlines is a material breach as a matter of law." *Indel Food Prods.*, 561 F. Supp. 3d at 729.

84. "Even if time is of the essence, timeliness requirements may be waived." *Indel Food Prods.*, 561 F. Supp. 3d at 730. "Waiver occurs when a party's actions 'induce[ ] the opposite party to believe that exact performance within the time designed in the contract will be not insisted upon.'" *Id.* (quoting *Laredo Hides Co.*, 513 S.W.2d at 218).

85. In this case, a valid contract between UniWell and Frain existed as evidenced by the terms in the PCL, which was signed by Frain on or around March 23, 2021, and by UniWell on March 31, 2021, as well as the terms ultimately set forth in invoice 772805-3. (*See* JPO at p. 6; Trial Ex. 35.)

86. While "time is of the essence" was not expressly included in the written valid contract between the parties, as none of the contract documents referred to above made any such reference to time being of the essence, the circumstances surrounding the creation of the contract indicate that time was of the essence based on the parties' communications prior to finalizing the contract.   Such circumstances include, but are not limited to the following: (a) the communications between the parties, including Riess, Tami Frain, Soto and Bailey in late February 2021 to March 2021 discussing the needs of UniWell to acquire a liquid rotary filler on an expedited basis to fulfill a commitment that UniWell had with GOJO Industries and (b) UniWell's cancellation of, with Defendant's knowledge, a purchase order with a different supplier for brand new machines and equipment and agreeing to pay approximately $400,000 more for refurbished machines that could be ready in approximately ten weeks.

87. Consequently, prior to the signing of the PCL, Defendants knew that: (a) time was of the essence, (b) Plaintiff's order was urgent, and (c) Plaintiff was on a strict timeline to receive the Machines.  (*See, e.g.*, Oct. 3 Trial Tr. 7.)

88. Defendants breached this material "time is of the essence" provision when they failed to have the Machines ready on the originally scheduled FAT date of June 1, 2021, or perform within the initial deadlines set within the contract. While UniWell was late in delivering the April 5 testing materials and the May 10 testing materials to Defendants, such a delay was not the cause of Defendants failing to meet the June 1, 2021 FAT deadline as Defendants did not have all the components it needed to conduct the FAT until right before the FAT was actually performed on June 29, 2021.

89. Consequently, when Defendants failed to meet the FAT date of June 1, 2021, UniWell had two choices: (1) discontinue its performance, rescind the contract, and sue for material breach or (2) continue performing and waive the other party's alleged material breach as an excuse for its non-performance. *See Chilton Ins. Co. v. Pate & Pate Enters.*, 930 S.W.2d 877, 887-88 (Tex. App.—San Antonio 1996, writ denied).

90. UniWell waived the material "time is of the essence" provision by treating the agreement as continuing, as evidenced, but not limited, to the following:

    a.    UniWell continuing forward with the project after Jackson, on June 2, 2021, gave UniWell the option to either cancel the partnership or move forward;

    b.    UniWell sending the May 10 testing materials, which was the second round of materials that needed to be sent, so that Frain received such materials on approximately June 8, 2021, seven days after the originally estimated FAT date of June 1, 2021;

    c.    Reiss' June 8, 2021, email to Jackson stating that "Frain must finish the line. That is not up for discussion."

     d.    UniWell attending and accepting the FAT on June 29, 2021, 28 days after the originally scheduled FAT date;

     e.    UniWell's actions in early July 2021 of beginning to make arrangements to have the Machines picked up from Defendants and shipped to UniWell's facility in Texas;

     f.    UniWell approving the video of the Markem Coder Machine on or around July 7, 2021, after the June 29, 2021, FAT date; and

     g.    UniWell making an additional $8,720 payment to Frain on or around July 7, 2021, for startup and training.

91. As of July 13, 2021, when Frain placed the Machines on their dock for pickup and transport, Frain had performed of all their obligations under the parties' contract.

92. On or about August 19, 2021, UniWell breached the contract when it failed to sign the lease agreement and elected to terminate the contract.

93. "The ultimate goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damages actually sustained as a result of the breach." *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th District] 2006, pet denied).

94. "The normal measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed." *Id.*

95. To recover, "a party must affirmatively prove each element of the applicable damages, and a fact finder has discretion to award damages only within the range of evidence presented at trial." *Garza v. Dealers Elec. Supply*, No. 14-02-01127-CV, 2004 WL 1193698, at *1 (Tex. App.—Houston [14th District] June 1, 2004, no pet.).

96. There are six possible remedies set out in the Texas UCC for a seller when a buyer breaches.[13] TEX. BUS. & COM. CODE § 2.703.

97. In this case, Defendants are seeking damages in the amount of $1,075,000.00, which is the total purchase price reflected in the Proposal for Engineered Services less the $311,253 already paid by UniWell (and not including the $8,720 UniWell pre-paid for startup and training costs).

98. Texas Business & Commerce Code § 2.708, which sets forth the measure of damages to a seller for a buyer's repudiation, states:

> (a) Subject to Subjection (b) and to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with incidental damages provided in this chapter (Section 7.10), but less expenses saved in consequence of the buyer's breach.
>
> (b) If the measure of damages provided in Subsection (a) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this chapter (Section 2.710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.[14]

---

[13] These six remedies are:

(1)  withhold delivery of such goods;
(2)  stop delivery by any bailee as hereafter provided (Section 2.705);
(3)  proceed under Section 2.704 respecting goods still unidentified to the contract;
(4)  resell and recover damages as hereafter provided (Section 2.706);
(5)  recover damages for non-acceptance (Section 2.708) or in the proper case the price (2.709);
(6)  cancel.

TEXAS BUS. & COM. CODE § 2.703.

[14] According to the comments to section 2.708, "[t]he provision of this section permitting recovery of expected profit including reasonable overhead **where the standard measure of damages is inadequate**, together with the new requirement that **price actions may be sustained only where resale is impractical**, are designed to eliminate the unfair and economically wasteful results arising under the older law when fixed price articles where involved."

TEX. BUS. & COM. CODE ANN. § 2.708 (footnote added).

99. Texas Business & Commercial Code section 2.709, which sets forth seller's damages in an action for the price, states:

> (a)     When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price
>
>> (1)     of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and
>>
>> (2)     of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.
>
> (b)     Where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale becomes possible he may resell them at any time prior to the collection of the judgment.  The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold.
>
> (c)     After the buyer has wrongfully rejected or revoked acceptance of the goods or has failed to make a payment due or has repudiated (Section 2.610 [(anticipatory repudiation)]), a seller who is held not entitled to the price under this section shall nevertheless be awarded damages for nonacceptance under the preceding section.

TEX. BUS. & COM. CODE § 2.709.[15]

100.     Incidental damages are defined as including "any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation,

---

TEX. BUS. & COM. CODE § 2.708 cmt. (emphasis added).

[15] "The action for the price is now generally limited to those cases where resale of the goods is impracticable except where the buyer has accepted the goods or where they have been destroyed after risk of loss has passed to the buyer.

TEX. BUS. & COM. CODE § 2.709 cmt.

care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." TEX. BUS. & COM. CODE § 2.710.

101.    In this case, Plaintiff did not accept any of the Machines and the Machines were not lost or damaged, so section 2.709(a)(1) is inapplicable.

102.    Moreover, as to section 2.709(a)(2), there is no evidence in the record that Defendants made any effort, much less a reasonable effort, to resell the machines, or the circumstances reasonably indicate such effort would be unavailing.

103.    Because there is no evidence in the record of the market price of the Machines at the time of UniWell's breach, Defendants cannot recover damages under subsection (a) of Section 2.708.

104.    Moreover, because there is no evidence that the measure of damages set forth in subsection (a) of section 2.708 is inadequate, Defendants cannot recover damages under subsection (b) of section 2.708.[16]

105.    The Machines are still in the possession of Defendants and each Machine has value and can be resold by Defendants.

106.    While Defendants presented evidence that it spent approximately $518,258.16 in refurbishing the Machines to the specifications required by UniWell, Defendants also state they are not seeking this amount as damages in this lawsuit.

---

[16] This is not a case where section 2.708(b) should be applied without first determining the applicability of 2.708(a) because there is no evidence that the Machines were such a specialized piece of equipment that they had no market value outside this contract. *See, e.g., Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.*, 814 S.W.2d 553, 556 (Tex. App.—Houston [1st District], no writ) (finding that profit plus incidental damages, as set forth in Texas Business and Commerce Code is the applicable measure of damages when a seller sues on buyer's breach of contract to purchase a specialized piece of equipment, to be manufactured by seller, that has no market value); *Fiberlok, Inc. v. LMS Enters., Inc.*, 976 F.2d 958 (5th Cir. 1992) (finding that buyer's breach under the contract was a direct cause of the closing of seller's business; thus, seller did not have a duty to mitigate under § 2.708(a) and the proper measure of damages was under § 2.708(b). In fact, the evidence showed that the Machines could be separated, retooled, and sold to a different buyer.

107.    Consequently, as Defendants have not presented evidence supporting their claims for damages of $1,075,000.000, the Court finds that Defendants are entitled to recover nominal damages in the amount of $1 from UniWell for breaching the contract.[17]

108.    Plaintiff is not entitled to the return of any money that it sent to Defendants.

**B.  Plaintiff's Common Law Fraud Claim Against Defendants**

109.    The elements of common law fraud are: (1) a knowing misrepresentation or reckless representation of a material fact, or the failure to disclose material facts, (2) with intent to induce action or inaction, (3) a reasonable reliance on the misrepresentation or omissions, and (4) injury due to such reliance. *See Baxsto, LLC v. Roxo Energy Co., LLC*, 668 S.W.3d 912, 927-28 (Tex. App.—Eastland 2023, no pet. h.).[18]

110.    During contract negotiations, Defendants did fail to disclose a material fact by not informing UniWell that Frain relied on and needed components from its own suppliers and could experience supplier delays when refurbishing the Machines.[19]

111.    However, Defendants did not fail to disclose this material fact with the necessary intent to induce UniWell to enter the contract sufficiently to support a common law claim of fraud.

---

[17] The Court notes that Defendants, in their Closing Argument [doc. 107], state, "As a result of UniWell's breach and repudiation by failure to perform Frain seeks . . . [i]ts damages for rent under §2A.529 in the amount of the total unpaid lease payments of $1,064,000." (Defendants' Closing Argument at 6.)  The Court finds that this section is inapplicable because there is no binding lease agreement between the parties as UniWell never signed the lease agreement.  Consequently, the ultimate transaction between the parties was for the sale of goods, which is governed by chapter 2 of the Texas Business and Commerce Code.

[18] "The Texas Supreme Court has carved out an exception to the economic loss rule for fraudulent inducement claims, reasoning that an independent legal duty exists not to fraudulently procure a contract." *West Loop Hosp., LLC v. Houston Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 487 (Tex. App.—Houston [1st Dist.] 2022, pet. Denied).

[19] The other alleged misrepresentations made by Defendants as to the June 1 FAT deadline and the 10-week lead time and speed of delivery are terms that were included in the contract; consequently, fraud claims based on these alleged misrepresentations are barred by the economic loss doctrine as they are tied directly to the contract between the parties and arise solely from the contractual relationship between the parties. *See, e.g.*, *Yumilicious Franchise, L.L.C. v. Barrie*, No. 3:13-CV-4841-L, 2015 WL 1856729, at *7 (N.D. Tex. Apr. 23, 2015).

112.     Further, the evidence does not support a finding that UniWell reasonably relied on Defendant's omission.

113.     Consequently, UniWell does not have a claim for common law fraud against Defendants and such claim is **DISMISSED WITH PREJUDICE.**

## C. Plaintiff's Negligent Misrepresentation Claim Against Defendants

114.     "Under Texas law, a claim for negligent misrepresentation consists of four elements: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation." *General Elec. Cap. Corp. v. Posey*, 415 F.3d 391, 395-96 (5th Cir. 2005); *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W. 2d 439, 442 (Tex. 1991) (stating that negligent misrepresentation elements are similar to those of fraud but provide a lower scienter requirement in that Defendant did not exercise reasonable care or competence in obtaining or communication information).

115.     However, "[u]nder the economic loss rule, "generally, a plaintiff cannot recover for a tort claim unless he or she suffers damages that are separate and independent from the economic losses recoverable under a breach of contract claim." *Walker v. Citimortgage, Inc.*, No. H-13-03111, 2014 WL 67245, at *6 (S.D. Tex. Jan. 8, 2014.)

116.     In this case, UniWell is seeking to recover from Defendant, the $319,973.00 it paid to Defendant in downpayments, crating charges, and startup and training costs pursuant to the explicit terms of the contract. Because these are economic losses Plaintiff

suffered from the loss of contractual benefits, such claim is barred by the economic loss rule. *See, e.g., ICI Constr., Inc. v. Hufcor, Inc.*, No. H-22-3347, 2023 WL 2392738, at *19 (S.D. Tex. Mar. 7, 2023) (finding, *inter alia*, that Plaintiff's claim for negligent representation was barred by the economic loss doctrine because Plaintiff, who was claiming damages in the amount of a deposit paid pursuant to the contract and cost overruns associated with securing another subcontractor, failed to allege facts that the harms Plaintiff sought to remedy were not merely the economic loss of contractual benefits).[20]

**D.   Plaintiff's Unjust Enrichment Claim Against Defendants**

117.     Under Texas law, there can be no claim for unjust enrichment when there is a binding contract between the parties. *See Edminster, Hinshaw, Russ and Assocs. Inc. v. Downe Township*, 953 F.3d 348, 352 (5th Cir. 2020) ("A party cannot recover on both a contractual and quasicontractual theory; success on the former precludes success on the latter."); *Adams v. Nissan North Am., Inc.*, 395 F. Supp. 3d 838, 854 (S.D. Tex. 2018) ("Plaintiff can plead alternative theories, but under Texas law, an unjust enrichment claim[ ] fails upon a showing that an express contract exists.") (internal quotations omitted); *Thompson v. Bank of Am., N.A.*, 13 F. Supp. 3d 636, 651-52 (N.D. Tex. 2014).

118.     Because the Court has found that a valid contact exists between the parties, Plaintiff's claim for unjust enrichment is **DISMISSED WITH PREJUDICE.**

---

[20] In addition, the Court notes that there is also some question whether silence, omission, failure to disclose, or concealment constitutes negligent misrepresentation under Texas law. *See In re SMIC, Ltd.*, No. 10-40120-DML-11, 2013 WL 4078704, at *7 (Bankr. N.D. Tex. Aug. 13, 2013) (stating that "[m]ost cases hold that mere omissions, silence, failure to disclose, and concealment are insufficient to satisfy the "false information" requirements of Restatement (Second) of Torts section 552" and that, those courts that reach a contrary conclusion, typically hold that liability lies only where the defendant is otherwise under a duty to disclose, such as a duty imposed by statutory law).

**E.  Plaintiff's Recission (or Revocation) Claim Against Defendants**

119.        Plaintiff seeks rescission (or revocation) as a remedy for Defendants' breach of contract, as set forth in Texas Business & Commerce Code section 2.711.   Because UniWell has been found to have breached the contract, this remedy is not available to UniWell.   Consequently, Plaintiff's claim for recission is **DISMISSED WITH PREJUDICE**.

**F.  Plaintiff's Claim for Exemplary Damages**

120.        Pursuant to Texas Civil and Remedies Code sections 41.001(5) and 41.003(a), exemplary damages may be awarded if Plaintiff proves by, clear and convincing evidence, that the harm resulted from: (1) fraud; (2) malice; or (3) gross negligence.

121.        Because, as set forth above, Plaintiff's claim for fraud has been dismissed with prejudice, the Court finds that Plaintiff's claim for exemplary damages should also be **DISMISSED WITH PREJUDICE**.

**G.  Defendants' Alternative Promissory Estoppel Claims and Quantum Meruit Claims Against Plaintiff**

122.        Because the Court has found in favor of Defendants on their breach of contract claims against UniWell, the Court will not consider Defendants' claims for promissory estoppel and quantum meruit[21] as Defendants pleaded these as alternative claims.   *See, e.g., Coim USA Inc. v. Sjobrand Inc.*, 663 F. Supp. 3d 684, 690 (N.D. Tex. 2023) (stating that, because Plaintiff's briefing concedes its quantum meruit claim is an alternative claim to its breach of contract clam, the Court need not reach the quantum meruit as it had granted Plaintiff's summary judgment as to its breach of contract claim).

---

[21] "Quantum meruit is an equitable remedy based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *Scientific Machine & Welding, Inc. v. FlashParking, Inc.*, 641 S.W.3d 454, 473 (Tex. App.—Austin, pet. denied) (internal quotations omitted).

123.     Moreover, "[q]uantum meruit is an equitable remedy based on an implied promise to pay for benefits received." *Chico Auto Parts & Serv., Inc. v. Crockett*, 512 S.W.3d 560, 573 (Tex. App.—El Paso, pet. denied). "A party generally cannot generally recover in quantum meruit when there is a valid express contract covering the services or materials furnished." *Scientific Machine & Welding*, 641 S.W.3d at 473; *see Natural Polymer Int'l Corp. v. Hartz Mountain Corp.*, 426 F. Supp. 3d 300, 311 (E.D. Tex. 2019).

124.     In addition, "promissory estoppel becomes available to a claimant only in the absence of a valid and enforceable contract" or if the promise is independent of the contract." *Natural Polymer Int'l*, 426 F. Supp. 3d at 300.  *See Carillo v. Bank of Am., N.A.*, No.  H-12-3096, 2013 WL 1558320, at *8 (S.D. Tex. Apr. 11, 2013) ("Promissory estoppel is an alternative to a breach of contract claim.").

125.     In this case, a valid contract exists between the parties that covers the sale of the Machines as well as all promises between the parties.

126.     Consequently, Defendants' claims for promissory estoppel and quantum meruit are **DISMISSED WITH PREJUDICE**.

## H. Defendants' Breach of the Covenant of Good Faith and Fair Dealing Against Plaintiff[22]

127.     Defendants claim that UniWell breached its obligation of good faith and fair dealing set forth in Texas Business and Commerce Code 1.201(b)(20) "by waiting for Frain to completely perform and provide the FAT in late June before advising the Frain

---

[22] The Court notes that Defendants do not list this specific claim in the JPO. (*See* JPO at p. 3.)  While "[i]t is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial," the Court, nevertheless, comments on this claim only to clarify that it is subsumed into Defendants' breach of contract claim that the Court has already ruled upon. *Huval v. Louisiana State Univ. Police Dep't*, No. 16-005533-BAJ-RLB, 2018 WL 3420805, at *1 (M.D. La. July 13, 2018).

Parties weeks later in July that it would not sign *any* lease and would not accept the Machines without concessions." (Frain's Closing Argument at 4.)

128.     "[UCC] section 1.304's obligation of good faith means that if a party fails 'to perform or enforce, in good faith, a specific duty or obligation under the contract,' then that party has breached the contract, or in some circumstances, loses a remedial right or power." *Hartman Income REIT Mgmt. v. Summer Energy, LLC*, No. 14-22-00469-CV, 2023 WL 8263647, at *7 (Tex. App.—Houston [14th District] Nov. 30, 2023, no pet. h.) (quoting TEX. BUS. & COM. CODE § 1.304 cmt. 1); *see* TEX. BUS. & COM. CODE §1.201(b)(2).

129.     In other words, "the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached." TEX. BUS. & COM. CODE § 1.304 cmt. 1.

130.     Because the Court has already found, as set forth *supra*, that UniWell breached the contract, the Court need not separately consider this claim.

**I.   Plaintiff and Defendants' Affirmative Defenses**

131.     To the extent any of Plaintiff or Defendants' affirmative defenses have not been ruled upon, all remaining affirmative defenses are **DENIED**.

**J.   Defendants' Request for Attorneys' Fees**

132.     "Generally under Texas Law, attorney's fees and litigation expenses may not be recovered unless provided for by statute or by contract between the parties." *Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc.*, 612 F.3d 800, 807 (5th Cir. 2010).

133.    It became necessary for Defendants to hire counsel in order to defend against Plaintiff's suit against them and to recover damages against Plaintiff for Defendants counterclaim against Plaintiff for breach of contract.

134.    Defendants are entitled to recover from Plaintiff their reasonable and necessary attorneys' fees and costs pursuant to section 38.001 of the Texas Civil Practice & Remedies Code.

135.    If Defendants seek such fees, Defendants shall file their motion for attorneys' fees no later than fourteen days after the entry of this memorandum opinion and the final judgment. *See* Fed. R. Civ. P. 54(d)(2)(B).

### K. Plaintiff's Request for Attorneys' Fees

136.    Because Plaintiff is found to have breached the contract, it is not a prevailing party. Consequently, Plaintiff is not entitled to the recovery of attorneys' fees. *See* TEX. CIV. PRAC. & REM. CODE § 38.001.

## IV.   CONCLUSION

Based on the foregoing, it is **ORDERED** that UniWell is liable to Defendants for breach of contract in the amount of $1.

It is further **ORDERED** that Defendants are entitled to prejudgment interest at a rate of 8.5% per year from August 17, 2022, the date Defendants filed their counterclaim against Plaintiff, to the day preceding the date judgment is rendered.[23]

---

[23] *See Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994) (stating that state law governs the award of prejudgment interest in diversity cases); *Giddy Up, LLC v. PRISM Graphics, Inc.*, No. 3:06-CV-0948-B, 2007 WL 3125312, at *1 (N.D. Tex. Oct. 24, 2007) (awarding prejudgment interest on actual damages assessed under Texas state law claims, including breach of contract claim, and noting that prejudgment interest does not accrue on any attorneys' fees awarded). "Texas common law allows prejudgment interest to accrue at the same rate as postjudgment interest on damages awarded for breach of contract." *Balfour Beatty Rail, Inc. v. Kansas City Southern Railway Co.*, 173 F. Supp. 3d 363, 461. "When, as here, an interest rate is not specified in the parties' contract, prejudgment interest is calculated on the statutory rate for postjudgment interest provided in section 304.003 of the Texas Finance Code." *Id.* The most applicable postjudgment interest rate in this case is the rate

It is further **ORDERED** that post-judgment interest shall accrue on the entire amount at a rate of 4.80% from the date this judgment is entered on the docket until paid. *See* 28 U.S.C. § 1961; *Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 234 (5th Cir. 2002) (noting that federal post-judgment interest statute applies even in diversity cases).

SIGNED February 1, 2024.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv

---

specified in Texas Finance Code § 304.003(c)(1), which is currently set at 8.5%. *See, e.g., Humphrey v. United Way of Texas Gulf Coast*, CIV. A. H-05-758, 2008 WL 5070057, at *8 (S.D. Tex. Nov. 20, 2008); *see also* Bd. of Governors of the Fed. Reserve Sys., *Selected Interest Rates (Weekly)* (January 25, 2024), http://www.federalreserve.gov/releases/h15/current/ (reporting that the prime rate as of January 25, 2024, is 8.5%). "In Texas, pre-judgment interest in a breach of contract action "begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date the suit is filed." *Continental Casualty Co. v. Macon Inc.*, No. 4:20-CV-068-A, 2020 WL 6437667, at *1 (N.D. Tex. June 24, 2020).